Filed 10/27/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.N., a Person Coming Under the Juvenile Court Law. | B302910 (Los Angeles County Super. Ct. No. CK99900) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.N., Defendant and Appellant; D.N., a Minor, etc., Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Reversed and remanded with instructions.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Linda B. Puertas, under appointment by the Court of Appeal, for Minor and Respondent.

Mary C. Wickham, County Counsel, Kristen P. Miles, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Dependency cases require the wisdom of Solomon. This is because juvenile courts typically balance parental rights against the child's best interests, important interests that sometimes conflict. The Legislature has given juvenile courts tools to ameliorate these conflicts, notably providing reunification services to a parent without custody of his or her child. The Legislature has set forth a deadline for how long reunification services can be offered to parents, after which the focus of the juvenile court is no longer to preserve parental rights, but instead, to secure permanency and security for the child. Thus, terminating reunification services to a parent is significant; it is often the prelude to termination of parental rights.

The case before us involves the minor, D.N., a teenager, who was failing in the group and foster care homes in which the juvenile court had placed him, and his father, who, because of his poverty and despite sincere efforts, could not find housing before expiration of the statutory deadline for providing reunification services. The questions before us are whether the juvenile court erred in finding it lacked authority to provide additional reunification services given that the statutory deadline had long passed, and whether, if so, given the confluence of father's poverty and efforts to find housing and D.N.'s failure to thrive in

2

a nonparental environment, the court abused its discretion in not giving father additional time to find housing.

We answer these questions in the affirmative where father's failure to reunify with D.N. was due solely to poverty, and terminating reunification services for father was not in D.N.'s best interests. These errors, moreover, caused the juvenile court to make a premature finding of detriment that could affect father in future dependency proceedings. Finally, we reject DCFS's assertion that an order returning D.N. to mother's physical custody issued after the filing of this appeal renders the instant appeal moot.

Accordingly, we reverse the denial of father's request for a continuance of the permanency review hearing, the juvenile court's finding of detriment, and the order terminating reunification services, and remand for further proceedings consistent with our opinion.

## FACTUAL AND PROCEDURAL BACKROUND

The record is extensive. We summarize only those portions of the proceedings to give context to our ruling.

1. ***The juvenile dependency proceedings preceding father's first appearance therein***

On June 7, 2013, Los Angeles County Department of Children and Family Services (DCFS) filed a juvenile dependency petition concerning five-year-old D.N., whom DCFS had removed from his mother's (mother's) physical custody and released to D.N.'s maternal great-grandmother (MGGM) on June 4, 2013. The petition averred that mother struck D.N. with a belt on "numerous prior occasions" and that jurisdiction was thus proper

under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b). According to the detention report accompanying the petition, mother had told the agency that D.N.'s father (father) "was not involved" in D.N.'s life and "his whereabouts [were] unknown."

At the detention hearing held on June 7, 2013, the juvenile court detained D.N. and placed him with his MGGM. Although father was not present at the detention hearing, the court declared that he is D.N.'s presumed father.

On December 13, 2013, the juvenile court sustained allegations in the first amended petition, asserting that jurisdiction was appropriate under section 300, subdivisions (a) and (b) because in May of 2013, mother "inappropriate[ly] physical[ly] disciplined" D.N. by "striking the child's body with a belt."

At the disposition hearing held on January 31, 2014, the juvenile court declared D.N. to be a dependent of the court, removed D.N. from mother's custody, placed D.N. in MGGM's custody, and allowed mother to reside with MGGM "provided [mother remained] in compliance [with her] case plan." The juvenile court further ordered that mother have monitored visits, and father have monitored visits upon contacting DCFS to secure a monitor approved by that agency. The juvenile court did not order reunification services for father because the court found that his whereabouts were unknown.

At the permanency review hearing conducted on February 23, 2015 pursuant to section 366.22, the juvenile court

---

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

4

placed D.N. in mother's custody and ordered DCFS to provide her with family maintenance services.[2]

On April 18, 2016, almost three years after the initial petition, the juvenile court removed D.N. from mother's custody because DCFS presented evidence that she had (inter alia) recently consumed marijuana. On April 22, 2016, DCFS filed a subsequent petition pursuant to section 342, alleging that jurisdiction was proper under section 300, subdivision (b) because of mother's alleged substance abuse. The agency detained D.N. on April 19, 2016 and placed him with MGGM.

At the detention hearing held on April 22, 2016, the juvenile court found a prima facie case for detaining D.N., authorized the minor to remain in MGGM's custody, and permitted mother to have monitored visits with D.N.[3] On August 8, 2016, the juvenile court held a jurisdiction and disposition hearing at which it sustained the subsequent petition, removed D.N. from mother's custody, ordered DCFS to provide mother with family reunification services, and stated that all prior orders not conflicting with that ruling remain in full force

---

[2] Although the minute order for the February 23, 2015 hearing does not expressly state that D.N. was returned to mother's custody, father, D.N., and DCFS concede that D.N. was returned to mother's custody at this hearing. (See *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party.' "].)

[3] At the detention hearing, mother's counsel represented that mother no longer resided with MGGM.

and effect (e.g., mother was entitled to monitored visits, and father was entitled to monitored visits once he contacted DCFS).

## 2. *The section 387 supplemental petition and proceedings and documents relating thereto*

On December 7, 2016, DCFS filed a supplemental petition pursuant to section 387, which alleged that MGGM violated the juvenile court's orders by "allow[ing] the mother . . . and father . . . to have unlimited access to the child and reside in the child's home against . . . [o]rders . . . that the mother and father are to have monitored visits with the child, with a DCFS approved monitor." The supplemental petition further alleged that "[d]uring the unmonitored visits with the father, the father threatened to physically abuse the child" and that "the child is afraid of the father." DCFS detained D.N. and placed him in foster care on December 2, 2016.

According to the detention report accompanying the supplemental petition, father told DCFS during a December 2, 2016 interview that "he did not know about DCFS being involved [with D.N.] due to the fact the mother never shared with him that the child was removed." The report also indicated that mother confirmed "she did not tell the father" D.N. had been removed from her custody.

At the detention hearing held on December 7, 2016, father made a special appearance to avoid waiving any challenges he could have to the propriety of DCFS's prior notice to him of the proceedings. The juvenile court thereafter found a prima facie case for removing D.N. from MGGM, vested temporary placement and custody of D.N. with DCFS, and authorized father to have monitored visits with D.N.

### 3. *Father's section 388 petition and the new dispositional rulings as to father*

On January 27, 2017, father filed a petition under section 388 that sought a ruling setting aside the juvenile court's January 31, 2014 dispositional order because prior to the disposition hearing, DCFS failed to show it had provided father with proper notice of the proceedings. (See § 388, subd. (a)(1) ["Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ."].) The juvenile court granted father's petition on March 15, 2017.

DCFS filed a jurisdiction/disposition report on April 4, 2017. In the report, DCFS asserted that on March 29, 2017, father told the agency that he was living with his mother, he worked 40 hours per week, and he "wanted help with [securing] housing."

On April 26, 2017, DCFS filed a last minute information report concerning DCFS's inspection of father's home, which the agency concluded was "not a suitable placement for [D.N.]" DCFS reported that father was staying at his mother's (paternal grandmother's or PGM's) 2-bedroom, 1-bathroom apartment, which housed PGM, father's step-father, father's sister, and three children, two of whom had an open DCFS case. DCFS reported that father slept in the living room and was looking for housing, and stated that "he d[id] not feel comfortable with taking custody of [D.N.] in his current residence because he [was] hardly there himself due to the lack of space." The agency reported that on April 13, 2017, it provided father with "a 2017 [e]dition of housing referrals from the Housing Rights Center."

7

On May 1, 2017, the juvenile court issued an order that: sustained the section 387 supplemental petition; removed D.N. from his parents' custody; ordered DCFS to allow mother and father to have monitored visits with D.N.; terminated mother's reunification services but offered her enhancement services; ordered DCFS to provide reunification services to father; and approved a case plan that required father to attend conjoint counseling with D.N., attend a parenting course on special needs children, and "work with the child's . . . wraparound team at his current placement."

4.    ***The October 30, 2017 six-month review hearing and documents relating thereto***

On October 12, 2017, DCFS filed a status review report.[4] Father reported he had not obtained appropriate housing and, although father told the agency on October 3, 2017 that he contacted " 'several' " prospective housing options, they had not returned his telephone calls. A social worker recommended that father "call 3-5 places a day and [father] agreed." "Father . . . stated that he need[ed] stable housing and [wanted] to have [D.N.] back as soon as possible," and D.N. "stated that he want[ed] to live with his mother or father."

DCFS reported that father was "not in compliance with his Court ordered parenting classes." Although "[f]ather originally planned to complete parenting classes through the child's WRAP team, . . . the child recently was placed in a home in which WRAP" services were not available. Father indicated that he did

---

[4] The remainder of this paragraph and the following three paragraphs summarize pertinent aspects of the October 12, 2017 status report.

8

not enroll in these courses on his own because "he did not know where to go" or "how many hours he needed[,]" and father had "scheduling problems due to his unpredictable job hours." DCFS reported that a social worker and "father [were] working on having father enrolled in services in the beginning of the month of October 2017."

DCFS claimed father was only partially compliant with the juvenile court's case plan concerning father's visits with D.N. "Father ha[d] visited the child several times, but [was] still not in full compliance. Father ha[d] expressed that the reason for the inconsistency [was] transportation, distance, and his work schedule." D.N. told the agency that "visitation with his father [was] going well and . . . he want[ed] more visits."

According to DCFS, although father had "been in regular contact with the agency, [he had] not fully complied with his Court orders." "Father ha[d] been involved in the case, but ha[d] not been proactive"; "[fa]ther need[ed] a steady push and reminders to handle his Court orders and responsibilities regarding the case," and a social worker told father that "he need[ed] to make a much stronger effort." Father asserted he had "trouble balancing life and 'the case,'" given that he worked "Monday-Friday most weeks" (although father noted he had "no set schedule and [was] on-call") and "like[d] to spend time with his girlfriend who live[d] in the valley on weekends." Father reiterated that "lack of housing and transportation" were "his biggest road blocks." DCFS opined "father needs more time to complete Court services and to find appropriate housing."

The court appointed special advocate (CASA) filed a report on October 27, 2017. The CASA reported father stated he was "working two part-time jobs, one at Disneyland and one as a

security guard" and he did "not make enough money to afford his own apartment.  According to the CASA, father said he was "looking for free parenting classes and [intended to] complete the classes as soon as possible, [but] not[ed] that most parenting classes cost money and he [could not] afford to pay them."  The CASA opined that if father "had assistance from DCFS to pay for the parenting classes, the classes would be completed sooner" and "the only significant barrier to [D.N.] returning to the home of his father is housing."

On October 30, 2017, the juvenile court held a six-month review hearing pursuant to section 366.21, subdivision (e).  At the hearing, the court noted that it had read and considered the October 12, 2017 status report and found that "the extent of progress made toward alleviating or mitigating the causes necessitating placement[ ] . . . [¶] [b]y father has been substantial."  Specifically, the court found that "father has[ ] consistently and regularly contacted and visited the child, has[ ] made significant progress in resolving the problems that led to the child's removal from the home, and has[ ] demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs . . . ."  The court also found that DCFS "complied with the case plan by providing or offering or making active efforts to provide or offer reasonable services to enable the child's safe return home and to complete and finalize the permanent placement of the child."

The juvenile court ordered DCFS to continue to provide reunification services to father.  In particular, the court ordered DCFS to "provide . . . father with transportation assistance and work with him to help him obtain housing."

10

5.      ***The June 14, 2018 12-month review hearing and documents relating thereto***

DCFS filed a status review report on April 5, 2018.[5]  The agency reported that on February 23, 2018, DCFS had removed D.N. from a foster home and placed him in a group home in part because he was "possibly displaying sexualized behaviors towards other children" while at the foster home.  The group home reported that while at its facility, D.N. exhibited "the following behaviors of concern:  [s]uicidal ideations and threats[,] . . . self-injurious behavior[,] . . . and homicidal ideation, threats, and attempts . . . ."  D.N. told DCFS that he hated the group home at which he was placed and wanted to "be placed with his mother or father, in a different group home, or foster home."

Father told DCFS that he had "been having trouble finding a parenting program that ha[d] a focus on special needs children"; the agency then provided father with additional parenting plan referrals, and father "stated that he would be enrolling in a program."  Father reported he had not yet secured suitable housing, but that he obtained new employment with a schedule that allowed him to "start consistent visitation with his son."  As of April 4, 2018, father had attended "less than 3 visits in this review period"; father attributed the infrequency of his visits to "the distance of the visits" and his prior work schedule.

DCFS recommended that father continue to receive family reunification services because he "need[ed] more time to complete Court ordered services and to find appropriate housing."  A DCFS

---

[5]  The remainder of this paragraph and the following two paragraphs summarize pertinent aspects of the April 5, 2018 status report.

social worker told father that "too much time [was] passing by without much improvement and that he need[ed] to make a much stronger effort." The agency claimed that although father had "been in regular contact with [DCFS], . . . . [he] ha[d] been reactive instead of proactive and [DCFS] . . . had to give [father] reminders and encouragement to handle Court orders and responsibilities in the case." The April 5, 2018 status report did not specifically discuss DCFS's efforts to assist father in securing affordable housing.

On June 14, 2018, the juvenile court held a 12-month review hearing pursuant to section 366.21, subdivision (f). At the hearing, the court admitted into evidence the status report filed on April 5, 2018. The court found that "the extent of progress made toward alleviating or mitigating the causes necessitating placement: . . . [¶] [b]y father ha[d] been partial." The court also found "by clear and convincing evidence that reasonable services ha[d] not been provided to the father to reunify with the child and the child's plan towards permanence." The court ordered DCFS to continue to provide father with family reunification services.

**6.** ***The January 24, 2019 permanency review hearing, the April 15, 2019 rehearing, and documents relating thereto***

On December 3, 2018, DCFS filed another status report. DCFS stated that father had "not yet obtained suitable housing despite applying for [a low-income] housing [program] and shelter housing." D.N. told DCFS "he would like to leave the group home to live with his father." Father reiterated that "the distance of [D.N.'s] group home in relation to his residence, his job schedule, lack of a car, and personal matters have made it

12

very difficult for him to visit and participate in conjoint therapy with [D.N.] as much as he should," but he also "maintain[ed] that he [was] committed to reunifying with his son and . . . that he want[ed] to continue to progress in the reunification process." The agency recommended that the court terminate father's reunification services "due to . . . father's non-compliance with Court orders and minimal visitation with the minor."[6]

The CASA assigned to this case filed a report on December 6, 2018. The CASA reported D.N. stated he wanted to live with his father. Father told the CASA that he was "having difficulty finding housing even though he ha[d] been attending meetings" for two low-cost housing programs and a social worker and a parent partner were "assisting him in this process." Father's parent partner told the CASA that father met with the parent partner and "speaks with her weekly on the phone." Father also stated he was coordinating with a social worker to complete the steps necessary to obtain approval for overnight visits at PGM's home. The CASA recommended that father continue to receive family reunification services and that "DCFS . . . continue to assist Father in finding low income housing."

---

[6] The December 3, 2018 status report once again stated that father had difficulty finding a parenting program for special needs children. The agency later filed a last minute information report disclosing that father had completed a parenting program on May 8, 2018. At the January 24, 2019 permanency review hearing discussed further *post*, DCFS's counsel did not dispute D.N.'s counsel's representation that this program was a parenting class for special needs children.

On January 24, 2019, DCFS filed a "delivered service log" that listed "All contacts, Services & Visits" offered by the agency in connection with this case between June 14, 2018 and December 13, 2018. The delivered service log indicated that on July 17, 2018, a social worker gave father a housing referral to an apartment complex and "encouraged him to fill out the application." It also showed that on October 11, 2018, the social worker e-mailed father "a letter stating that he has an open DCFS case and is currently homeless for the purpose of him obtaining homeless housing at the Union Rescue Mission." The log further stated that on November 13, 2018, the social worker mailed father a copy of the December 3, 2018 status report and a housing referral packet.

On January 24, 2019, a juvenile court commissioner held a permanency review hearing pursuant to section 366.22. The commissioner admitted into evidence the status report that was filed on December 3, 2018 and the "delivered service log" that was filed on January 24, 2019.

DCFS's counsel abandoned the agency's position that father had not complied with the case plan by stating: "[DCFS's] position today is that the father is in compliance, that only barrier [*sic*] to return of the child to his custody is his lack of housing." Significantly, the commissioner found "by clear and convincing evidence that reasonable services have not been provided to father to reunify with the child and the child's plan towards permanence." The commissioner also found that father had "substantially complied with his case plan," and "[t]he only barrier to return of the child is [father's] homelessness." The commissioner ordered DCFS to provide six more months of family

reunification services to father, and referred father to a program called 211 for a housing assessment.

On February 20, 2019, DCFS filed an application for rehearing of the January 24, 2019 rulings, which the juvenile court granted as to the finding that the agency failed to provide reasonable family reunification services to father. At the rehearing held on April 15, 2019, the juvenile court reaffirmed the commissioner's findings that father's "progress made toward alleviating or mitigating the causes necessitating placement" had been "substantial" and that DCFS failed to provide reasonable services to father, along with the commissioner's previous ruling that the agency must continue to provide father with reunification services.

7.    ***The October 8, 2019 order granting mother's section 388 petition, the October 11, 2019 permanency review hearing, and the December 6, 2019 rehearing, and documents relating thereto***

On July 9, 2019, DCFS filed another status review report.[7] DCFS noted that D.N. was "losing hope in regards [*sic*] to going home," and began "to act out to display his feeling of hopelessness . . . . in class" by failing to "sit still long enough to complete many assignments" and having "physical and verbal fights with several classmates."

Father "express[ed] difficulty in finding housing, stating, 'every place I apply to tells me no or they might accept me if I had my son[,]' " and stated that "lack of housing opportunity, lack of

---

[7] The remainder of this paragraph and the next four paragraphs discuss relevant aspects of the July 9, 2019 status report.

15

transportation, and distance from [D.N.] [were father's] biggest barriers" to reunifying with D.N. Father stated he applied to "approximately twenty different apartments between Los Angeles and Riverside Counties without success," and that although the parent partner assigned to this matter had "referred him to multiple housing options in Riverside County, . . . all of the options reported no vacancies, asked him to sign up for their waitlist, or informed him that they would consider him if he had his child with him already." He reported that the 211 housing referral from the court and the housing referrals provided by DCFS "all had the same or similar results." A social worker told father that DCFS could ascertain whether a program called "STOP" could finance his first and last month's rent, and the worker provided father with "a housing referral for multiple housing programs."

Father "expressed openness" to the following possibilities that DCFS presented to him: "reunifying with [D.N.] at his girlfriend's home [(located in Riverside)], homeless shelter, or hotel close to his current residence . . . ." Father stated that "he, his girlfriend, his girlfriend's mother, and his girlfriend's grandmother all live at the Riverside residence." Father "reported that all members of the family can pass live scan background checks, but he would need to speak with his girlfriend about the possibility of [D.N.] living with them." "As of the writing of [that status] report, [father had] not updated [DCFS] regarding the option of having [D.N.] placed in" his girlfriend's family's home. Additionally, DCFS reported that father had "continued to visit [D.N.] sporadically, [and had] not had consistent overnight weekend visits due to his weekend work

16

schedule," and the agency observed that father's "visits ha[d] become more difficult due to relocating to Riverside, CA."

DCFS further noted that although it had attempted to contact all of D.N.'s known relatives, only mother and father had responded to the agency's mail or telephone messages.

Although it opined that father "ha[d] complied with Court and [DCFS] orders, completed all Court ordered services outside of conjoint therapy,[8] and [was] making great efforts to continue phone calls and overnight visitation," DCFS recommended that the juvenile court terminate father's family reunification services. The agency also recommended that the juvenile court find that D.N. was "not a proper subject for adoption and ha[d] no one willing to accept legal guardian[ship]." Consequently, DCFS sought an order providing that D.N. would "remain in long term foster care as a permanent plan." (Capitalization omitted.)

On July 23, 2019, the CASA filed a report as well. The CASA noted that DCFS placed D.N. in his then-current group home on April 6, 2018, and that D.N. told the CASA that he wanted to live with father or maternal grandmother (MGM.) Father told the CASA that he continued to have difficulty finding affordable housing even though he had contacted several housing agencies and housing websites. The CASA recommended that

---

8 In the July 9, 2019 status report, the agency opined that father was merely "partially compliant" with the conjoint therapy aspect of the case plan because father and D.N. had completed only six conjoint sessions since therapy commenced on September 20, 2018. (Boldface & capitalization omitted.) DCFS did not identify the number of conjoint sessions it believed would have been adequate for father to have complied with this part of the case plan.

17

the juvenile court place D.N. with his father "if appropriate housing is secured."

DCFS filed two last minute information reports that were dated September 12, 2019.  The first report stated that DCFS had conducted a home assessment of MGM and, on May 8, 2019, it denied her request to place D.N. in her residence primarily because MGM "has a long history of substance abuse[,] [¶] . . . [¶] a limited healthy support system[,] . . . [¶] . . . [and] demonstrated poor judgement, specifically in relation to child care."

The second last minute information report dated September 12, 2019 addressed father's unsuccessful efforts at securing housing and DCFS's unsuccessful attempts at placing D.N. in a "lower level of care" than the group home at which he resided.  (Boldface omitted.)  Father informed DCFS on June 26, 2019 that his girlfriend's family was no longer interested in having D.N. placed in their home.

In late August 2019, DCFS referred father to the family reunification housing subsidy program and further inquired as to father's efforts to obtain housing.  Father stated that he obtained full-time employment in Riverside and applied to multiple apartments in that area; he reported that several apartments denied his application and he had not heard back from others.  Additionally, on August 29, 2019, DCFS attempted to move D.N. from his group home to a foster home, but D.N. threw a tantrum and refused to leave because he did not want to live far from MGM.

On September 9, 2019, mother filed a petition pursuant to section 388 to set aside the May 1, 2017 order terminating her family reunification services.  On October 8, 2019, the juvenile court granted mother's section 388 petition, reinstated her family

reunification services, and scheduled a permanency review hearing for mother for April 7, 2020.

DCFS filed another last minute information report on October 8, 2019. The report noted that DCFS had not yet been able to find a suitable foster home for D.N. In addition, father told DCFS that "several housing options [had] contacted him, but [they] were not valid options due to them not accepting 3rd party checks," and that "he continue[d] to work with his 211 worker closely and [was] continuing to apply to potential housing options."

On October 11, 2019, a commissioner of the juvenile court held another permanency review hearing for father. At the hearing, father's counsel orally requested that the court utilize its authority under section 352 to extend father's reunification services and continue the permanency review hearing, arguing that father had completed his case plan, the only barrier to reunification was father's lack of suitable housing, and, notwithstanding father's efforts to secure such housing, factors outside of his control (including "lack of finances") have prevented father from reunifying with D.N. D.N.'s counsel joined in father's request for a continuance under section 352.

The commissioner granted father's request for a continuance under section 352, and extended father's family reunification services until April 7, 2020 (i.e., the date scheduled for mother's permanency review hearing), at which time a further permanency review hearing for father would be held. The commissioner found that it would be in D.N.'s best interest to extend reunification services, extenuating circumstances warranted the continuance, and "[f]ather ha[d] fully complied

19

with his case plan and the only barrier to reunification [was] housing."

On November 1, 2019, DCFS filed an application for a rehearing of the commissioner's October 11, 2019 order, which the juvenile court granted. At the rehearing held on December 6, 2019, the juvenile court admitted into evidence, inter alia, the July 9, 2019 status report, the July 23, 2019 CASA report, the last minute information reports dated September 12, 2019,[9] and the October 8, 2019 last minute information report.

The juvenile court thereafter denied father's oral request for a continuance under section 352 and terminated father's reunification services. In support of these rulings, the juvenile court found that reasonable services had been offered to father and "[r]eturn of the child to the physical custody of [father] would pose substantial risk of detriment to his physical and/or mental health creating a continuing necessity for and appropriateness of the current placement." The court also found that father's attempts to secure suitable housing for him and his son were "sincere" and that he had made "substantial" progress "toward alleviating or mitigating the causes necessitating placement." The court intimated that its denial of father's continuance request would not prejudice him because he could file a section 388 petition to seek custody of D.N. if and when father obtained housing. Additionally, upon being reminded by mother's counsel that her permanency review hearing was scheduled for April 7, 2020, the juvenile court decided not to

---

[9] The juvenile court referred to these two last minute information reports as if they were just one report.

20

schedule a hearing under section 366.26 to terminate father's parental rights.

On December 9, 2019, father appealed the juvenile court's December 6, 2019 order.

## 8.    *The proceedings following the December 6, 2019 rehearing*

Mother's permanency review hearing was ultimately continued from April 7, 2020 to September 8, 2020.  At the September 8, 2020 permanency review hearing, the juvenile court ordered DCFS to return D.N. to mother's custody, retained jurisdiction over the case, ordered mother to submit to drug testing, and scheduled a section 364 review hearing for March 8, 2021.[10]  On September 9, 2020, father appealed the September 8, 2020 order.[11]  That appeal is not before us.

---

[10]  "[S]ection 364 . . . governs subsequent review hearings when a dependent child has been placed back in the custody of one parent."  (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650 (*Gabriel L.*).)  At a section 364 review hearing, "[t]he court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn."  (See § 364, subd. (c).)

[11]  We previously granted father's request for judicial notice of the September 8, 2020 minute order and of father's notice of appeal that was stamped "received" by the juvenile court clerk.  (Capitalization omitted.)  (See Evid. Code, §§ 452, subd. (d) & 459.)  We also, sua sponte, take judicial notice of the version of that same notice of appeal that was later file-stamped by the juvenile court clerk, along with the minute orders that continued

## DISCUSSION

At the December 6, 2019 hearing, the juvenile court denied father's request under section 352 for a continuance of the section 366.22 permanency review hearing and of father's family reunification services.

Section 366.22, subdivision (a) provides in pertinent part: "[T]he permanency review hearing shall occur within 18 months after the date the child was originally removed from the physical custody of his or her parent or legal guardian. After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . [¶] . . . [¶] . . . Unless the conditions in subdivision (b) are met[12] and the child is not returned to a parent or legal guardian at the permanency review hearing, the court shall order that a hearing be held pursuant to Section 366.26 in order to determine whether adoption, . . . guardianship, or continued placement in foster care is the most appropriate plan for the child. . . . [and] order termination of

mother's permanency review hearing from April 7, 2020 to September 8, 2020.

[12] As explained *post*, Discussion part B.2, it does not appear that section 366.22, subdivision (b) is applicable to this case.

reunification services to the parent or legal guardian." (See
§ 366.22, subds. (a)(1) & (a)(3).)

In turn, section 352, subdivision (a) provides in relevant
part that "[u]pon request of counsel[,] . . . the court may continue
any hearing under this chapter beyond the time limit within
which the hearing is otherwise required to be held, provided that
a continuance shall not be granted that is contrary to the interest
of the minor" and "[c]ontinuances shall be granted only upon a
showing of good cause and only for that period of time shown to
be necessary by the evidence presented at the hearing on the
motion for the continuance." (See § 352, subds. (a)(1) & (a)(2).)

"We review the juvenile court's decision to deny a
continuance for abuse of discretion. [Citation.] 'Discretion is
abused when a decision is arbitrary, capricious or patently
absurd and results in a manifest miscarriage of justice.'
[Citation.]" (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056 (*D.Y.*).)

As discussed in more detail below, we conclude the juvenile
court abused its discretion in denying father's continuance
request for two reasons. First, the juvenile court erroneously
believed it lacked authority to extend family reunification
services beyond 24 months. Second, the undisputed facts
established that good cause supported the request—a
continuance was in D.N.'s best interest and father needed at least
some additional time to obtain suitable housing.[13]

---

[13] Because we conclude the juvenile court erred in denying
father's request to continue the section 366.22 permanency
review hearing, we need not reach father's claim that he would
have been entitled to the return of D.N. to his custody at any
such permanency review hearing. (Cf. *In re Elizabeth R.* (1995)
35 Cal.App.4th 1774, 1777, 1786–1787 (*Elizabeth R.*) [declining
to review the substance of a parent's challenges to certain rulings

23

DCFS argues we should dismiss the instant appeal as moot. We thus address that challenge first.

## A.  Father's Appeal Is Not Moot

DCFS maintains that "[e]ven if this Court were to find the juvenile court previously erred when it terminated father's family reunification services, [the Court of Appeal] can provide no effective relief because . . . the [juvenile] court's [September 8, 2020] order returning the child to mother[ ] results in father having no entitlement to family reunification services." (See also *In re E.T.* (2013) 217 Cal.App.4th 426, 436 (*E.T.*) ["An appeal may become moot where subsequent events, including orders by the juvenile court, render it impossible for the reviewing court to grant effective relief."].)  In support of this argument, DCFS invokes section 16507, subdivision (b), which provides:  "Family reunification services shall only be provided when a child has been placed in out-of-home care, or is in the care of a previously noncustodial parent under the supervision of the juvenile court." (§ 16507, subd. (b).)  DCFS asserts that "[n]either circumstance applies here" because "D.N. has been returned to mother, who was the child's custodial parent at the outset of the case."

DCFS's argument rests on the assumption that mother could not constitute "a previously noncustodial parent" for the purposes of section 16507, subdivision (b), even though D.N. had been living in group or foster care homes for nearly four years at

at the section 366.22 permanency review hearing because the juvenile court should have considered whether a continuance under section 352 was appropriate].)

24

the time the juvenile court returned the child to mother's custody. DCFS fails to develop adequately this assumption in its briefing. Accordingly, we do not address it.

In any event, father's purported ineligibility for reunification services would not render this appeal moot. The September 8, 2020 order did not address or otherwise alter the juvenile court's prior finding that returning D.N. to father's custody would create a substantial risk of detriment to the minor. Because this finding "may have collateral consequences" in this case, father's appeal is not moot. (See *E.T.*, *supra*, 217 Cal.App.4th at p. 436 [" ' "An issue is not moot if the purported error infects the outcome of subsequent proceedings." ' "].) Were we to rule the issue moot, the juvenile court's finding of detriment may escape review despite the potential deleterious consequences to father of that ruling.

For instance, if the juvenile court terminates its jurisdiction at a later section 364 hearing, then this detriment finding could affect whether the court grants mother sole physical custody of D.N. in the exit order.[14] This is because the juvenile court's prior finding of detriment established that returning D.N.

---

[14] "When terminating its jurisdiction over a child who has been declared a dependent child of the court, section 362.4 authorizes the juvenile court to issue a custody and visitation order (commonly referred to as an 'exit order') that will become part of the relevant family law file and remain in effect in the family law action 'until modified or terminated by a subsequent order.' " (*In re T.S.* (2020) 52 Cal.App.5th 503, 513 (*T.S.*).) "If no family law action is pending, the court's order 'may be used as the sole basis for opening a file in the superior court of the county in which the parent, who has been given custody, resides.' [Citation.]" (*Id.* at p. 513, fn. 3.)

25

to his father would contravene the child's best interest. (See *T.S.*, *supra*, 52 Cal.App.5th at pp. 513–514 ["[T]he court [is] required to consider at [a section 364] hearing the totality of the circumstances and the children's best interest in determining whether jurisdiction should be terminated and in fashioning appropriate exit orders."].) Although DCFS correctly points out that section 364 empowers the juvenile court to modify its prior orders, (see *T.S.*, *supra*, at p. 514), the juvenile court should not be able to rely in future proceedings on a detriment finding that was premature when made given father's sincere efforts to obtain housing and D.N.'s failure to thrive in foster care or group home settings.

In addition, were mother to resume her use of narcotics, as she had in the past as set forth in our Factual and Procedural Background, the juvenile court could remove D.N. from her custody. (See *T.S.*, *supra*, 52 Cal.App.5th at p. 514 [noting that section 387 authorizes DCFS to "file a supplemental petition to modify a previous order by removing a child from the physical custody of a parent and directing placement in a foster home"]; § 387, subd. (b) ["The supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child . . . ."].)

Further, if mother does not timely mitigate the substantial risk of harm to D.N. resulting from her substance use, then the juvenile court could set a section 366.26 hearing to determine whether to terminate both parents' rights, given that the court has already found by a preponderance of the evidence that returning the child to father's custody poses a substantial risk to

D.N.'s "safety, protection, or physical or emotional well-being." (See § 366.22, subd. (a)(1) ["After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment."]; *id.*, subd. (a)(3) [providing in relevant part that if the child is not returned to a parent at the permanency review hearing held pursuant to section 362.22, subdivision (a)(1), "the court shall order that a hearing be held pursuant to Section 366.26 in order to determine whether adoption, . . . guardianship, or continued placement in foster care is the most appropriate plan for the child."]; *Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1788 ["If the child is adoptable and if no extraordinary situation exists, termination of parental rights at the section 366.26 hearing is highly likely."].) Thereafter, father would have to overcome " 'a rebuttable presumption that continued foster care is in the best interests of the child' " in order to secure custody of D.N. (See *Elizabeth R.*, *supra*, at p. 1796.) On the other hand, father would have no such obstacle if we granted him appellate relief by reversing the detriment finding.

Additionally, we note that even if the September 8, 2020 order would effectively bar father from receiving family *reunification* services in the future, he could nonetheless secure *some type* of child welfare services upon

27

remand.[15]  "If, after a period during which both parents were offered reunification services, the child is then placed with one parent," the juvenile court "may, but is not required to, continue services for the noncustodial parent."  (See *Gabriel L.*, *supra*, 172 Cal.App.4th at p. 647.)  "[T]he court has discretion to provide services for the nonreunifying parent if the court determines that doing so will serve the child's best interests."  (See *id.* at p. 652.)  As this discretion is "broad," a "reviewing court will not reverse the court's order in the absence of a clear abuse of discretion."  (See *ibid.*)  Whether continuing to provide father with child welfare services would still serve D.N.'s best interests and, if so, whether these services should take the form of reunification services, are questions for the juvenile court to address upon remand.

---

[15]  " '[C]hild welfare services' means public social services that are directed toward the accomplishment of any or all of the following purposes:  [¶] (A) Protecting and promoting the welfare of all children, including disabled, homeless, dependent, or neglected children[;] [¶] . . . [¶] (C) Preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems, and preventing breakup of the family where the prevention of child removal is desirable and possible[; and] [¶] (D) Restoring to their families children who have been removed, by the provision of services to the child and the families."  (See § 16501, subds. (a)(1)(A), (a)(1)(C), & (a)(1)(D).)  Child welfare services include, inter alia, "family preservation services, family maintenance services, family reunification services, and permanent placement services . . . ."  (See § 16501, subd. (a)(2).)

28

**B.** **The Juvenile Court Erroneously Believed It Lacked the Authority to Grant Father's Continuance Request**

1.  *The rationale for the juvenile court's ruling*

The record demonstrates that at the December 6, 2019 hearing, the juvenile court denied father's request for a continuance because it believed it lacked the authority to grant the request.

DCFS's application for a rehearing sought a ruling setting aside the commissioner's October 11, 2019 order authorizing father to continue to receive reunification services on the ground that it "was without a basis in law, since there was no statutory or case law provision for reunification services beyond the twenty[-]four month date." Although DCFS's application for a rehearing was not entirely clear on this point, it appears that the agency was contending that the "twenty[-]four month" timeframe began when father started receiving reunification services on May 1, 2017.

Similarly, the juvenile court indicated it believed father could obtain only one six-month continuance of the section 366.22 18-month permanency review hearing such that the hearing should have occurred no later than November 2017 (i.e., six months after the father initially received reunification services in May 2017). Specifically, the juvenile court indicated it believed that because the detention hearing occurred in June 2013 and D.N. was initially removed from mother's custody at the disposition hearing in January 2014, section 366.22 required that an 18-month permanency review hearing be held in "2014 or 2015" and the father could obtain only one six-month extension of the permanency review hearing. The juvenile court also

expressed its skepticism regarding whether section 352 authorized it to continue the permanency review hearing further. In particular, the court asked D.N.'s counsel: "How many continuances does she [(father's counsel)] get under 352 since the father got one in November of 2017 and has continued to get them for the last two years? How many continuances do you get under 352?"

Besides the juvenile court's belief that it lacked the authority to grant father's request for a continuance, the record does not reveal any other rationale for the court's ruling denying this request.

2. *The juvenile court's authority to depart from the statutory time limits on family reunification services*

Admittedly, the juvenile dependency system's statutory scheme generally limits the time in which a parent can receive family reunification services. Section 361.5, subdivision (a)(1)(A) provides that, as a general rule, if a child "was three years of age or older" as of "the date of initial removal from the physical custody of his or her parent or guardian," then "court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in Section 361.49,[16] unless the child is returned to the home of the parent or guardian." (See § 361.5, subd. (a)(1)(A).) That 12-month date elapsed long before the

---

[16] "Section 361.49 provides that a child is deemed to have entered foster care on the *earlier* of the date of the jurisdiction hearing or the date that is 60 days after the child is initially removed from the physical custody of his or her parent." (*In re M.S.* (2019) 41 Cal.App.5th 568, 594 & fn. 15 (*M.S.*).)

juvenile court terminated father's reunification services on December 6, 2019.[17]

Furthermore, although section 361.5, subdivision (a)(3)(A) creates an exception to subdivision (a)(1)(A)'s general rule, that exception does not, by its terms, support father's request for a continuance of reunification services.  It provides that "court-ordered services may be extended *up to a maximum time period not to exceed 18 months after the date the child was originally removed* from physical custody of his or her parent or guardian if it can be shown, at the hearing held pursuant to subdivision (f) of Section 366.21, that the permanent plan for the child is that he or she will be returned and safely maintained in the home within the extended time period."  (See § 361.5, subd. (a)(3)(A), italics added.)  Even if father had shown that D.N. would be returned and safely maintained in his home within any continued reunification period, this provision would not have been available to him because as of the December 6, 2019 hearing, more than 18 months had elapsed since D.N. had been removed from his custody.[18]

---

[17]  Even assuming for the sake of argument that, because the juvenile court found that DCFS initially failed to provide father with proper notice of the proceedings, D.N. was not properly removed from father's custody until the May 1, 2017 hearing at which the court sustained the supplemental petition, the 12-month period would have expired on May 1, 2018.

[18]  Although section 361.5, subdivision (a)(4)(A) allows for "court-ordered services [to] be extended up to a maximum time period not to exceed 24 months after the date the child was originally removed from physical custody of his or her parent," that provision is applicable only if certain findings are made at a "hearing held pursuant to subdivision (b) of Section 366.22 . . . ."

Notwithstanding these statutory limits on reunification services, a juvenile court may invoke section 352 to extend family reunification services beyond these limits if there are "extraordinary circumstances which militate[ ] in favor of" such an extension. (See *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1388–1389 (*Andrea L.*); see also *M.S., supra*, 41 Cal.App.5th at p. 596 & fn. 16 [holding that, under certain circumstances, "reunification services can . . . be ordered or provided beyond section 361.5, subdivision (a)(4)(A)'s 24-month limit"].) Extraordinary circumstances exist when "inadequate services" are offered by the child welfare agency or "an external force over which [the parent has] no control" prevented the parent from completing a case plan. (See *Andrea L.*, *supra*, at pp. 1388–1389; see also *In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1213, 1215 (*G.S.R.*) [holding that the juvenile court could "restart the clock on reunification services and related efforts, including housing assistance" to remedy the child welfare agency's failure

---

(See § 361.5, subd. (a)(4)(A).) Section 366.22, subdivision (b) applies only if the "parent or legal guardian . . . is making significant and consistent progress in a court-ordered residential substance abuse treatment program, a parent . . . was either a minor parent or a nonminor dependent parent at the time of the initial hearing making significant and consistent progress in establishing a safe home for the child's return, or [is] a parent recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security and making significant and consistent progress in establishing a safe home for the child's return . . . ." (See § 366.22, subd. (b).) There is no indication in the record that father satisfies any of these criteria and, even if he did, the December 6, 2019 hearing was well beyond the 24-month date.

to "craft[ ] a plan to help [the father] obtain affordable housing for his family"].)

For instance, a juvenile court could continue a section 366.22 permanency review hearing and delay the termination of reunification services for "a mother who had worked hard to comply with the case plan but had been hospitalized during a critical stage of the reunification period." (See *Andrea L.*, *supra*, 64 Cal.App.4th at p. 1388, citing *Elizabeth R.*, *supra*, 35 Cal.App.4th at pp. 1790–1792; *Elizabeth R.*, *supra*, at p. 1799 ["A section 352 continuance . . . is a mechanism the court could have utilized had it not erroneously concluded it was required to terminate services and order a selection and implementation hearing."].) Conversely, a "mother's relapse into cocaine abuse" likely would not constitute extraordinary circumstances warranting the extension of reunification services beyond the statutory limits. (See *Andrea L.*, *supra*, at p. 1389.)

The rationale for allowing for an "emergency escape valve in those rare instances in which the juvenile court determines the best interests of the child would be served by a continuance of the 18-month review hearing" is that the " 'Legislature never intended a strict enforcement' " of these statutory limits to " 'override all other concerns including preservation of the family when appropriate.' " (See *Elizabeth R.*, *supra*, 35 Cal.App.4th at pp. 1798–1799; *M.S.*, *supra*, 41 Cal.App.5th at pp. 594–595.) Put differently, under unusual and rare circumstances, "the statutory and constitutional interests of the parent and child in reunification if possible prevails [*sic*] over" such limits. (See *M.S.*, at p. 594.)

33

Thus, the juvenile court erred in finding it lacked the authority to grant father's continuance request.  (See *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1215 [" 'A decision that rests on an error of law constitutes an abuse of discretion.' [Citation.]"].)

As discussed further below, the juvenile court's findings and the undisputed facts demonstrate that, notwithstanding DCFS's provision of reasonable reunification services and father's sincere efforts in attempting to obtain suitable housing, an external force over which father had no control prevented him from reunifying with D.N. within section 361.5, subdivision (a)'s restrictions—i.e., the lack of readily accessible affordable housing.  The undisputed facts also establish that a continuance of the section 366.22 hearing and of the father's reunification services was the only means by which the juvenile court could have effectuated the Legislature's " 'strong preference for maintaining the family relationships if at all possible,' " (see *Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1787), and was in the best interests of D.N.

## C. As a Matter of Law, Good Cause Supported Father's Request for a Continuance

### 1. *Extraordinary circumstances existed such that there was good cause for continuing the permanency review hearing and father's reunification services*

As discussed in greater detail below, this case presented "extraordinary circumstances" giving rise to good cause to grant father's continuance request because, notwithstanding father's sincere efforts and DCFS's assistance, external forces resulted in

34

his inability to secure affordable housing for himself and D.N. (See *Andrea L.*, *supra*, 64 Cal.App.4th at p. 1388.)

DCFS and the juvenile court recognized that father did not have suitable housing because he was indigent. DCFS's records showed that the agency had provided father with a letter intended to help him obtain "homeless housing" at a rescue mission, and the court referred father to the 211 housing program on account of his "homelessness."

Furthermore, DCFS's counsel conceded at the December 6, 2019 hearing that the only obstacle to D.N.'s placement with father was his lack of adequate housing for D.N. The juvenile court found at that hearing that since the prior permanency review hearing, "reasonable services have been provided to the father to reunify with the child . . . ."[19] Yet, the juvenile court found at that hearing that father's attempts to obtain housing were "sincere," and that he had made "substantial" progress "toward alleviating or mitigating the causes necessitating placement."[20] Father reported during the

_____

[19] Father challenges that finding on appeal because "[DCFS] had been unable to find housing for [father and D.N.]" and father had made "every effort to find housing." "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The mere fact that DCFS and father were unable to secure suitable housing for D.N. does not establish that the agency's services failed to satisfy this reasonableness standard.

[20] Although DCFS suggests it does not believe that father acted in good faith in attempting to secure affordable housing, the agency does not challenge the juvenile court's findings that

most recent six-month period in which he received reunification services that, notwithstanding his sincere efforts to procure housing, several apartments simply denied his applications, others did not respond to his applications, and still others would not allow him to move in because they did not accept third-party checks or because he did not "have" D.N.

This lack of affordable housing constituted an "external force over which [father] ha[d] no control" that warranted an extension of reunification services beyond the statutory limits. (See *Andrea L.*, *supra*, 64 Cal.App.4th at p. 1389.)

> 2. *Denying father's request for continuance, terminating his reunification services, and requiring father to file a section 388 petition if he secures suitable housing do not constitute a reasonable alternative to a continuance*

As we noted at the outset of our discussion, section 366.22, subdivision (a)(3) provides that if "the child is not returned to a parent or legal guardian at the permanency review hearing, . . . . [t]he court shall . . . order termination of reunification services to the parent or legal guardian." (See § 366.22, subd. (a)(3).) Section 366.22, subdivision (a)(1) in turn provides that at the permanency review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the

father's attempts to obtain an affordable home for D.N. were sincere and that he substantially complied with DCFS's case plan.

36

safety, protection, or physical or emotional well-being of the child." (See § 366.22, subd. (a)(1).)

At the December 6, 2019 hearing, the juvenile court terminated father's reunification services pursuant to section 366.22 and found that returning D.N. to father's custody would create a substantial risk of detriment to D.N. That finding is reviewed for substantial evidence. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.)

The juvenile court erred in making a finding of detriment without giving father more time to find housing. As we explained *ante,* Discussion part C.1, father's "lack of housing . . . arises directly out of the fact of his poverty," which is not "a legitimate ground for removing" D.N. from father's custody. (See *G.S.R.,* *supra,* 159 Cal.App.4th at pp. 1212–1214.) As a matter of law, "indigency, by itself, does not make one an unfit parent" and, therefore, cannot support a finding that returning D.N. to father's custody would create a substantial risk of detriment to the child. (See *id.* at p. 1212; see also *id.* at p. 1214 ["As for the finding of detriment based on [father's] lack of housing, that finding arises directly out of the fact of his poverty. The record is devoid of evidence that, but for his inability to obtain housing, [father] is incapable of adequately parenting his sons."]; see also *In re S.S.* (Oct. 2, 2020, E074852) __ Cal.App.5th __, __ [2020 Cal.App.Lexis 926, at pp. *37–38] (*S.S.*) ["[F]ather couldn't regain custody of [the minor] because of his economic situation, not his parenting ability. He lacked adequate housing . . . . We agree with the court in *G.S.R.* that these housing problems do not support the trial court's detriment finding as a basis for terminating father's parental rights."].) Given that father's lack of housing was the only barrier to reunifying with D.N. and that D.N. was failing to

37

thrive in group and foster care homes, the juvenile court should have given father more time to find housing instead of terminating his reunification services and making a premature finding of detriment.[21]

The juvenile court suggested that the denial of father's continuance request would not prejudice him because he could simply file a section 388 petition and seek the return of the child if father obtained suitable housing. To the extent the juvenile court determined that a section 388 petition was an equivalent remedy to a continuance, we disagree.

If father were relegated to filing a section 388 petition to set aside the December 6, 2019 order, he would have been required to " 'show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child.' " (See *Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1796.)

---

[21] DCFS argues that we should not reach this issue because father forfeited his challenge to the juvenile court's detriment finding by failing to raise it below. We exercise our discretion to entertain this appellate challenge because of the unique circumstances of this case. Given that the facts relevant to our assessment of the detriment finding are undisputed, that finding presents an important and purely legal issue. (See *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345 ["Although the forfeiture doctrine applies in dependency cases and the failure to object to a disposition order on a specific ground generally forfeits a parent's right to pursue that issue on appeal [citations], when the appeal involves an important and purely legal issue subject to our independent review . . . , we have discretion to entertain the challenge to the juvenile court's order notwithstanding the parent's failure to object on that basis in the juvenile court."].)

In contrast, if the section 366.22 hearing were instead postponed, DCFS would have borne "the burden of establishing" by a preponderance of the evidence that "the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child" in order to prevent D.N. from being reunited with father. (See § 366.22, subd. (a)(1).) Finally, as we observed *ante*, Discussion part A, if a hearing to terminate his parental rights under section 366.26 were ultimately scheduled, father would also confront " 'a rebuttable presumption that continued foster care is in the best interests of the child.' " (See *Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1796.)

Thus, a continuance of the section 366.22 permanency review hearing would have effectuated the Legislature's " 'strong preference for maintaining the family relationships if at all possible[,]' " a preference that is especially apt here because DCFS agreed that lack of suitable housing was the only basis for finding detriment to D.N. were he reunited with his father, and the juvenile court found that father made "sincere" efforts to find suitable housing and otherwise substantially complied with his case plan. (See *Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1787; see *id.* at p. 1788 [" 'The focus during the prepermanent planning stages is preserving the family whenever possible [citation] whereas the focus after the permanent planning hearing is to provide the dependent children with stable, permanent homes.' "].) Thus, the juvenile court's denial of the continuance motion " 'result[ed] in a manifest miscarriage of justice.' " (See *D.Y.*, *supra*, 26 Cal.App.5th at p. 1056.)

We acknowledge that the 31-month period in which father was attempting to reunify with D.N. is considerably longer than

the statutory allowance for reunification services, as well as the period reunification services were offered in other cases holding that poverty alone cannot be the basis for a detriment finding. (See *G.S.R.*, *supra*, 159 Cal.App.4th at pp. 1206–1208 [father began receiving reunification services in March 2005, and the juvenile court terminated those services in March 2006]; *S.S.*, *supra*, __ Cal.App.5th at pp. __ [2020 Cal.App.Lexis 926, at pp. *1–3] [the juvenile court ordered DCFS to provide father with reunification services at a jurisdiction and disposition hearing held in July 2018, but terminated those services in February 2019].)

Our holding is based on the unique circumstances of this family at the time the court denied continuing the permanency review hearing. No party disputes the juvenile court's finding that father had made substantial progress toward alleviating or mitigating the causes necessitating placement, or the fact that father applied for housing at multiple locations only to be rebuffed at the housing options available to someone of his scant means. At the same time, D.N. was consistently failing in group and foster care homes. For example, in these settings, he was perceived as displaying sexualized behavior to other children, suicidal and homicidal ideation, and aggressive behavior. He strenuously expressed his wish to live with father, mother, or MGM.

Recall the balance of the parties' interests discussed at the beginning of our opinion. Had the juvenile court continued the permanency review hearing, it would have harmonized father's parental interest in caring for his son with the son's best interests in finding a parental placement in which he hoped to thrive. Refusing to continue that hearing, discontinuing

40

reunification services, and prematurely finding detriment thwarted those interests, and thus resulted " 'in a manifest miscarriage of justice.' " (See *D.Y.*, *supra*, 26 Cal.App.5th at p. 1056.) There may come a time when the balance between parental rights and D.N.'s need for permanency shifts in favor of a permanent and secure home for D.N., father's poverty notwithstanding. That time, however, had not yet come based on the record before us.

> 3. *We reject DCFS's claim that father's oral motion was procedurally deficient*

Section 352, subdivision (a)(3) provides that, "[i]n order to obtain a motion for a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance." (See § 352, subd. (a)(3).) DCFS does not argue expressly that the juvenile court should have denied father's oral motion for a continuance pursuant to this subdivision. Rather, the agency remarks in passing that "there was no written motion, and no good cause was demonstrated at the hearing."

To the extent that DCFS asks us to affirm the juvenile court's denial of the continuance motion on that basis, we find that DCFS has waived that argument by failing to clarify whether it intended to raise this claim at all. (See *Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 826, fn. 5 [" 'Although it is the appellant's task to show error, there is a corresponding obligation on the part of the respondent to aid the appellate court in sustaining the judgment. "[I]t is as much the duty of the respondent to assist the [appellate] court upon the

41

appeal as it is to properly present a case in the first instance, in the court below." [Citations.]' "].)

Furthermore, at the December 6, 2019 hearing, DCFS was already well-aware of father's intention to seek a continuance because he initially made this request at the underlying October 11, 2019 hearing before the commissioner. Thus, there was good cause for excusing father's failure to file a written notice of motion at least two days before the December 6, 2019 rehearing.

## D. The Undisputed Facts Establish a Continuance Was Not Contrary to D.N.'s Best Interest

Section 352, subdivision (a)(1) provides that "a continuance shall not be granted that is contrary to the interest of the minor," and "[i]n considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (See § 352, subd. (a)(1).)

Continuing the December 6, 2019 hearing would not have undermined D.N.'s interest in the prompt resolution of his custody status, deprived him of a stable environment, or prolonged his temporary placement. On the date of the hearing, mother did not have physical custody of D.N., and her permanency review hearing was scheduled for approximately five months later. MGM was the only other relative who expressed any interest in having custody of D.N., but DCFS determined that she was not a suitable custodian largely because of her history of substance abuse. Several months before the December 6, 2019 hearing, DCFS attempted to move D.N. from the group home at which he was placed to a foster home. D.N.

42

refused to leave the group home because he stated that the foster home was too far from his MGM. Additionally, the court declined to set a hearing to terminate father's parental rights under section 366.26. Thus, the record establishes that D.N. would have remained in a temporary placement regardless of whether the juvenile court granted father's continuance request.

Hence, the undisputed facts establish that as of the December 6, 2019 hearing, a continuance of that hearing and of father's reunification services was not contrary to D.N.'s interest.

E. **Father Needed Additional Time to Procure Suitable Housing**

Section 352, subdivision (a)(2) provides that "[c]ontinuances shall be granted only upon a showing of good cause and *only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance*." (See § 352, subd. (a)(2), italics added.)

DCFS does not challenge the juvenile court's finding that father's sincere efforts to secure housing had thus far proven unsuccessful. DCFS does not dispute that D.N. was not thriving in the group and foster care settings in which he had been living for several years. D.N. was already in his mid-teens and desperately wanted a chance to live with family before it was too late. A brief continuance would have given D.N. that chance. Instead, the juvenile court's orders deprived D.N. in his own words, of hope. Thus, the undisputed facts demonstrate that father needed at least some additional time to attempt to reunify with D.N.

DCFS suggests that extending reunification services would have been futile. DCFS contends that "father's housing had been an issue for more than two years[ ] and he presented no evidence

43

at the hearing supporting the likelihood of reunification occurring with additional time."

DCFS's argument is not based on a fair reading of the record. The agency concedes the juvenile court found that for one year of the reunification period, the agency failed to provide reasonable family reunification services to father. It is speculative to conclude from this record that with reasonable extra time, father's sincere and continuous efforts and DCFS's reasonable assistance could not yield affordable housing suitable for father and D.N. (whether in Los Angeles County or elsewhere). Because the juvenile court concluded that it lacked the authority to grant father's request, it never considered how much more time would have been reasonable to allow father to secure suitable housing.

Again, we observe that D.N. had been cycling unsuccessfully through foster care and group homes. Father had demonstrated a strong interest in caring for D.N. and satisfying the requirements of his case plan. Under these circumstances, the juvenile court's failure to continue the permanency review hearing to enable father to find suitable housing, and its termination of reunification services, were an abuse of discretion.[22]

---

[22] We note that, regardless of whether father obtains services upon remand, it is necessary to reverse the order terminating his reunification services because it was the product of a permanency review hearing that should not have happened, but instead, should have been continued. (See § 366.22, subd. (a)(3) [providing that reunification services must be terminated if the child is not returned to the parent at this permanency review hearing].)

44

## DISPOSITION

The juvenile court's ruling denying father's motion for a continuance of the section 366.22 permanency review hearing, its finding that returning D.N. to father's physical custody would create a substantial risk of detriment to the child, and its order terminating father's reunification services are reversed. We remand this matter to the juvenile court to consider whether DCFS should continue to provide father with child welfare services, order visitation or grant joint legal or physical custody over D.N., and for such other proceedings based on the record then before it.

<u>CERTIFIED FOR PUBLICATION.</u>

BENDIX, Acting P. J.

We concur:

CHANEY, J.

SINANIAN, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.